**Julie MARLEY, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S02–0009–CR–521.

Supreme Court of Indiana.

May 30, 2001.

John Pinnow, Greenwood, IN, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Randi E. Froug, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## ON PETITION FOR TRANSFER

BOEHM, Justice.

We grant transfer in this criminal appeal to discuss the application of the effects of battery statute.

### Factual and Procedural Background

Julie Marley, aged thirty-one, and her boyfriend, Gary Williams, were charged with murder, attempted murder, criminal deviate conduct, and two counts of criminal confinement, all in connection with the death of Donald Marley, Marley's uncle, aged seventy-one. According to Marley, on the evening of June 10, 1997, Marley, Williams, and Donald drank beer and wine for approximately sixteen hours at Donald's house. Gloria Smalling, a neighbor of Donald's, joined this marathon at some point before Marley and Donald began to argue. After Donald threw a plate at Marley's head, Marley left Donald's house, spoke with her mother by telephone, and returned. The fighting resumed when Marley demanded an apology from Donald, who had been convicted of molesting Marley when she was fourteen years old. During the course of the argument, Donald cut Marley's finger and leg with a knife, and she stabbed him in the chest. The argument appeared to subside when Marley drank a beer and gave another to Donald. However, when Marley renewed her demand for an apology for Donald's past behavior, he replied, "You little bitch, you wanted it," and, according to Williams, Marley "went ballistic."

Marley then forced Donald and Smalling at knifepoint to an upstairs bedroom and tied up Smalling. Marley compelled Smalling to perform oral sex on Donald, then tortured, stabbed, and strangled Donald and beat both Donald and Smalling with a hammer. Donald was killed, but Smalling managed to escape and call the police. When the police found Marley, she

confessed to killing Donald, but stated that she did not recall most of the attack, which Smalling said lasted between six and eight hours. Smalling believed Williams was present for the entire attack, but was unable to recall where he was for the majority of the incident. According to Smalling, at one point, Williams "beat and choked" her.

Defense counsel hired a clinical psychologist, Dr. Bart Ferraro, who diagnosed Marley with dysthymia, post-traumatic stress disorder, polysubstance abuse, and mixed personality disorder. He concluded that her problems stemmed largely from early childhood molestation by Donald. In his opinion, at the time of the crimes, she was not conscious of her actions due to post-traumatic stress disorder and dissociation. In his view, she met the criteria for an insanity defense. Marley did not file a notice of insanity defense as required by the Indiana Code.

On January 7, 1999, the State filed a motion in limine to exclude a videotape of Marley and Donald engaged in various sexual acts. The motion also sought to exclude Ferraro's testimony because Marley had not given notice of an insanity defense. Marley responded that the videotape established her dissociative state and that the doctor's testimony was admissible, not to support an insanity defense, but to rebut the mens rea element of murder. The trial court conducted hearings on the motions and denied the State's motion with respect to Ferraro's testimony, but determined that because Ferraro's testimony related to mental disorders, in order to present it, Marley had to comply with the effects of battery statute, Indiana Code sections 35–41–1–3.3 and 35–41–3–11, which the trial court concluded requires a notice of an insanity defense. The trial court ruled that it would allow Marley to file her notice belatedly. The trial court

also indicated that the videotape was inadmissible, but agreed to a continuance and took the motion under advisement.

On January 22, Marley filed her notice of intent to proceed with both self-defense and insanity as well as the defense of reasonable doubt with respect to mens rea and voluntariness. As required by the insanity defense statute, the trial court appointed two experts to evaluate Marley's mental condition. Both diagnosed Marley as suffering from a variety of mental disorders. On June 4, Marley filed a second notice of defense and argued that the trial court was violating her Sixth Amendment and Fourteenth Amendment rights by prohibiting her from admitting evidence of her relationship with Donald and her mental status to show lack of mens rea and voluntariness without complying with the insanity defense. On July 1, the trial court held another evidentiary hearing on the State's motion in limine, reaffirmed its earlier ruling with respect to Ferraro's testimony, and ruled the videotape inadmissible.

Marley requested that the trial court certify the order for interlocutory appeal, which it did. The Court of Appeals affirmed the trial court's rulings. *Marley v. State*, 729 N.E.2d 1011 (Ind.Ct.App.2000). Judge Brook, in dissent, found that the effects of battery statute did not apply to this case because Marley and Donald were not "cohabitants" as that term is used in the statute. *Id.* at 1017–19.

## I. Effects of Battery Statute

### A. *Exclusivity*

Marley first claims that, for a variety of reasons, she should be allowed to present her medical evidence as a defense to the mens rea or the voluntariness elements of the charged crimes. The trial court ruled that the evidence, including Ferraro's testimony, would be admissible only under the effects of battery statute, and that the

statute incorporated the requirements for maintaining an insanity defense. This is an issue of first impression.

The effects of battery statute is found among the "defenses relating to culpability." It applies to a defendant who either (1) "raises the issue [of] not responsible as a result of mental disease or defect" (for convenience we refer to this as an "insanity" defense)[1] or (2) "claims to have used justifiable reasonable force" ("self-defense"), and, in conjunction with either, "raises the issue that the defendant was at the time of the alleged crime suffering from the effects of battery as a result of the past course of conduct of the individual who is the victim of the alleged crime." Ind.Code § 35–41–3–11 (1998).

Although not limited by its terms to battered women, the statute typically comes into play with respect to efforts to introduce evidence of battered women's syndrome in defense of a charge against the mistreated victim. It is far from clear from the language of this statute what it is intended to do. It does not explicitly limit the use of battered women's syndrome evidence to the self-defense and insanity theories. It imposes notice requirements on a defendant claiming self-defense, but has no comparable provision with respect to insanity. Presumably the absence of any notice requirement with respect to insanity is because the insanity defense statute has its own notice requirement. *Id.* § 35–36–2–1. Self-defense has no similar provision. The sum of this is that, although the statute states that it applies to an insanity defense, it has no substantive or procedural provisions with respect to insanity. Read literally, the statute does nothing with respect to insanity, and the reference to the insanity defense is surplusage.

The State contends that the statute was a legislative response to *Barrett v. State,* 675 N.E.2d 1112, 1116 (Ind.Ct.App.1996), *trans. denied,* and is intended to impose notice requirements where battered women's syndrome is asserted as the basis of a defense. In *Barrett,* the Court of Appeals held that evidence of battered women's syndrome was admissible to negate the defendant's mens rea in a charge of neglect of her child who died at the hands of her boyfriend. In determining that battered women's syndrome evidence was not limited to cases of self-defense, the court noted that "Indiana courts have considered the admissibility of BWS based on the facts of each particular case," *id.,* and that "our supreme court held that evidence of BWS was admissible 'so long as it is relevant,'" *id.* at 1117 (quoting *Isaacs v. State,* 659 N.E.2d 1036, 1041 (Ind.1995)). *Barrett* did not address the question whether, assuming this evidence was relevant, it was relevant because it bore on a species of insanity that triggered the procedural requirements of the insanity statute, or was relevant for some other reason.

■ The inability to form a subjective appreciation of the effect of neglect of a dependant is within the literal terms of the insanity defense because it is a "severally abnormal mental condition" that "impairs [the defendant's] perception." As already observed, if the purpose of the 1997 legislation was to require that battered women's syndrome evidence be limited to self-defense and insanity, the language chosen is less than clear. Nev-

---

1. The defense we refer to in short as "insanity" is more precisely defined as being "unable to appreciate the wrongfulness of the conduct" as a result of "a severely abnormal mental condition that grossly and demonstrably impairs [the defendant's] perception."

Ind.Code § 35–41–3–6 (1998). If such a defense is asserted the statute requires notice to the trial court, *id.* § 35–36–2–1, and places the burden of establishing the defense on the defendant by a preponderance of the evidence, *id.* § 35–41–4–1(b).

ertheless, we agree with the trial court that the statute is intended to have that effect, if for no other reason than it would otherwise be meaningless as to insanity. More importantly, the legislative response to *Barrett* suggests that the General Assembly considered the *Barrett* defense to be in the nature of an insanity defense as that is defined in the Indiana Code. Marley's claim is of the same sort, and was therefore properly held subject to the insanity statute.

■ Marley's claim of a "dissociative state" as a result of battered women's syndrome, like Barrett's claim, is a claim that an abnormal condition has impaired the defendant's perception of the action taken. If the lack of knowledge or intent is attributable to a "mental disease or defect," which is the nature of Marley's evidence, it falls within the legislature's definition of the "insanity" defense and must be asserted accordingly. In this respect, *Barrett* is to be distinguished from *McClain v. State,* 678 N.E.2d 104, 105, 108 (Ind.1997), where we held that evidence establishing automatism to negate voluntariness is not subject to the insanity defense statute if it is not the product of a mental disease or defect. However, as we noted in *McClain,* the definition of insanity if read broadly could embrace a wide variety of mental conditions that are not properly held subject to the insanity statute. *Id.* at 108. *McClain* staked out a small area of mental states, e.g., sleepwalking, epilepsy, and metabolic disorders, that are not attributable to any mental disease or defect but nevertheless negate the voluntariness requirement. *See also Reed v. State,* 693 N.E.2d 988, 991–92 (Ind.Ct.App. 1998) (defendant need not give notice of transient ischemic attack (TIA) evidence under insanity statute because the impairment is not the result of a "diseased mind"). In contrast, we conclude that the legislature has determined that, where the defendant claims that battered women's syndrome has affected her ability to appreciate the wrongfulness of her conduct, she must proceed under the insanity defense. *Barrett* predated the statute. To the extent that *Barrett* suggests that battered women's syndrome evidence is admissible on the issue of lack of intent or knowledge without compliance with the insanity statute, it is superseded by the 1997 legislation.

■■ Limiting the admissibility of battered women's syndrome evidence in this manner is consistent with well established principles of Indiana law. Over one hundred years ago, in *Sage v. State,* 91 Ind. 141, 145 (1883), this Court held that the current statutory scheme did not recognize a middle ground between sanity and insanity. Thus, insanity was recognizable as a defense, but not as a mitigating circumstance. Similarly, our current statutory scheme recognizes no "middle ground" between insanity and sanity. More recently, this Court summarized this principle, stating that, "[i]n Indiana we do not recognize degrees of insanity." *Cardine v. State,* 475 N.E.2d 696, 698 (Ind.1985) (quoting *Cowell v. State,* 263 Ind. 344, 348–49, 331 N.E.2d 21, 24 (1975)); *accord Holmes v. State,* 671 N.E.2d 841, 857–58 (Ind.1996) (instruction to jury that evidence of mental state was properly offered to negate defendant's capacity to form requisite intent was erroneous). Rather, "within the ambit of the terms comprising the definition of legal insanity[,] complete mental incapacity must be demonstrated before criminal responsibility can be relieved." *Cowell,* 263 Ind. at 349, 331 N.E.2d at 24 (citations omitted). In short, as a general proposition Indiana has long held that a defendant may not submit evidence relating to mental disease or defect except through an insanity defense.

■ The effects of battery statute, Marley contends, has the effect of impermissibly shifting the burden of proof to her as to an element of the crime. Marley correctly points out that federal due process requires the State to bear the burden of proof on every element of a criminal offense. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). We do not agree that the statute violates the principles of *In re Winship.* Rather, the burden remains on the State to demonstrate the elements of the crime, namely that Marley "knowingly or intentionally" killed Donald. Ind.Code § 35–42–1–1. Whether Marley knowingly or intentionally killed Donald is an inquiry distinct from the defense raised under the insanity statute, which provides that a person is not responsible "if, as a result of mental disease or defect, [s]he was unable to appreciate the wrongfulness of the conduct at the time of the offense." *Id.* § 35–41–3–6. The federal due process constitutionality of placing the burden on the defendant to establish that defense by a preponderance of the evidence is well settled.[2] *Price v. State,* 274 Ind. 479, 483, 412 N.E.2d 783, 785 (1980); *accord Leland v. Oregon,* 343 U.S. 790, 798, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (upholding Oregon statute that required defendant to prove insanity beyond a reasonable doubt); *Rivera v. State,* 351 A.2d 561, 562–63 (Del.1976) (upholding federal constitutionality of Delaware statute that required defendant to prove mental illness by a preponderance of the evidence).

■ Barring battered women's syndrome evidence as to a defendant's state of mind where the defendant has not complied with the insanity statute does not affect its admissibility for other purposes. For example, in *Barrett,* the Court of Appeals concluded that the defendant was "denied the opportunity to present evidence essential to her defense" when she was prevented from responding to prosecutor's questioning during opening and closing arguments as to why she remained with her abusive boyfriend. *Barrett,* 675 N.E.2d at 1117. We agree with the Court of Appeals that evidence of battered women's syndrome, in the form of her lay testimony and expert testimony, would have been relevant to explain Barrett's motive for remaining with her boyfriend. *See also Isaacs,* 659 N.E.2d at 1040–41 (evidence of battered women's syndrome admissible to refute defendant's claim that relationship with former wife he was accused of murdering was "friendly"); *Dausch v. State,* 616 N.E.2d 13, 15 (Ind. 1993) (evidence of battered women's syndrome admitted to explain alleged rape victim's recanting of story of abuse at hands of defendant); *Carnahan v. State,* 681 N.E.2d 1164, 1166–67 (Ind.Ct.App. 1997) (evidence of battered women's syndrome relevant to credibility of wife who claimed husband had abused her but then recanted at trial); *Allen v. State,* 566 N.E.2d 1047, 1053 (Ind.Ct.App.1991) (evidence was admitted at sentencing that woman convicted of criminal recklessness had been abused by the victim husband).

### B. Bar Against Ex Post Facto Laws

■ Marley claims that the statute cannot apply to her without violating the United States and Indiana constitutional prohibitions against ex post facto laws.[3] Article

---

2. No separate claim is raised under the Indiana constitution and we express no opinion on any state constitutional issue.

3. Although Marley did not raise this issue in the trial court, both she and the State agree that ex post facto violations constitute fundamental error that may be raised for the first time on appeal. *Nuerge v. State,* 677 N.E.2d 1043, 1045–47 (Ind.Ct.App.1997), *trans. denied.*

# 1130

I, Section 24 of the Indiana Constitution provides that, "No ex post facto law ... shall ever be passed." The United States Constitution contains a similar provision in Article I, Section 10, clause 1.

■■■ An ex post facto law is retroactive in application. *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). In this case, the charged offenses occurred on June 11, 1997 and the effects of battery statute became effective on July 1, 1997. The law is clearly retroactive as applied to this case. However, to run afoul of the constitutional bar to ex post facto laws, the law must "increase[ ] [the defendant's] punishment, change[ ] the elements of or ultimate facts necessary to prove the offense, or deprive[ ] defendant of some defense or lesser punishment that was available at the time of the crime." *Crawford v. State*, 669 N.E.2d 141, 150 (Ind.1996). In *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390–91, 1 L.Ed. 648 (1798), the United States Supreme Court made it clear that changes to a rule of evidence may implicate the prohibition against ex post facto laws. However, as that Court has since articulated it:

> [A]lterations [to rules of evidence] which do not increase the punishment, nor change the ingredients of the offence, or the ultimate facts necessary to establish guilt, but—leaving untouched the nature of the crime and the amount or degree of proof essential to conviction—only remove existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure.

*Thompson v. Missouri*, 171 U.S. 380, 385–86, 18 S.Ct. 922, 43 L.Ed. 204 (1898).

Marley argues that the effects of battery statute deprives her of a battered women's defense that was recognized in *Barrett*, 675 N.E.2d at 1116. The Court of Appeals in Marley's case expressed the view that *Barrett* did not "recognize a defense" based on battered women's syndrome. Rather, *Barrett* held that battered women's syndrome evidence can be admissible to show lack of mens rea, an otherwise recognized defense. To the extent the statute changed Indiana law, all it did was make explicit that this form of evidence must come in, if at all, through the procedures that govern proof of other types of insanity. To the extent that the Court of Appeals decision in *Barrett* could be read to establish an "intermediate" insanity defense, there is no ex post facto implication because the Court of Appeals was not free to change the law of the state contrary to precedent of this Court. Thus, this statute does not raise the ex post facto concern that the legislature deprived the defendant of a defense or lesser punishment.

## C. *The Application of the Statute to Marley and Donald as "Cohabitants"*

■■■ The effects of battery statute requires the victim to be the abused individual's (1) spouse or former spouse, (2) parent, (3) guardian or former guardian, (4) custodian or former custodian, or (5) cohabitant or former cohabitant. Ind.Code § 35-41-1-3.3(2). Because it is clear that the relationship between Marley and Donald was not among the first four criteria, the issue becomes whether they were "cohabitants or former cohabitants." Marley claims that the effects of battery statute does not apply to her because she and Donald were not "cohabitants" or "former cohabitants." The majority opinion in the Court of Appeals disagreed stating, "the legislature did not intend 'cohabitant' to necessarily mean a sexual partner, and, thus, Donald was a cohabitant as to Mar-

ley." *Marley*, 729 N.E.2d at 1016. The dissent argued that both the plain meaning of cohabitation and the use of the term cohabitant in other contexts lead to the conclusion that "the term 'cohabitant' appears to be one of limited application, meaning . . . a person who lives with another as husband and wife or in a comparable sexual relationship." *Id.* at 1019. We agree with the dissent that the term "cohabitant" requires not only living together under one roof, but also has an element of an ongoing relationship of at least lovers.

"Cohabit" means "to live together as or as if a married couple." *Merriam Wesbster's Collegiate Dictionary* 223 (10th ed.1993). Black's Law Dictionary defines "cohabitation" as "[t]he fact or state of living together, especially as partners in life, usually with the suggestion of sexual relations." *Black's* 254 (7th ed.1999). The usual meaning of the term cohabitation thus implies at least a temporary life partner arrangement of some sort. This interpretation is further supported by the use of the terms "cohabit" and "cohabitation" in other contexts. *See* Ind.Code § 31–11–10–2; *Id.* § 31–16–14–1; *Graves v. Graves*, 123 Ind.App. 618, 621, 112 N.E.2d 869, 870 (1953) ("We use the terms 'cohabit' and 'cohabitation' as implying sexual intercourse.") (quoting *Burns v. Burns*, 60 Ind. 259, 260 (1877)).

At the time Donald was killed, the record does not support a "cohabitation" between Marley and her uncle. Under some circumstances an adult and a fourteen year old might be viewed as "cohabitants," but we need not address that question here. In this case, the trial court was confronted with evidence that a sexual relationship between Marley and Donald resumed when Marley was twenty-one years old and living with Donald. This is suffi-cient to support a relationship of "former cohabitants" as provided in the statute.

## II. Admission of Videotape

Marley also claims that the trial court erred in ruling that a videotape containing over one hundred minutes of her and Donald engaged in a variety of sexual activities was inadmissible. The trial court's order stated:

> The Court granted the Motion in Limine with respect to the video tape because of the following Rule 403 analysis: the defense could not lay a foundation for it; the defense could not authenticate it; we do not know the date the video tape was made, or the circumstances of the sexual encounter; it would be distracting to the jury; and, it would cause an undue consumption of time.

Marley claims that the probative value of the tape is not substantially outweighed by the danger of unfair prejudice, and by not allowing her to present this evidence, the trial court is violating her Sixth and Fourteenth Amendment right to present a defense. The State counters that the trial court was acting within its discretion when it ruled that the videotape was inadmissible.

Trial courts are given wide latitude in Rule 403 rulings, and we review those determinations for an abuse of discretion. *Ingram v. State*, 715 N.E.2d 405, 408 (Ind.1999). The trial court held two hearings on the admissibility of the tape and heard extensive argument and evidence, including three expert witnesses on Marley's mental status. Marley argues that the tape is relevant and probative because it depicts the relationship between Marley and Donald, illustrates the doctors' testimony, corroborates Marley's testimony, and helps the jury understand dissociation. The State responds that doctors will be testifying at length about these con-

cepts at trial, and the sexually explicit tape would add very little to the jury's understanding of these issues. As the trial court pointed out, the circumstances of the tape's creation are not established, so it is speculative whether it in fact demonstrates a dissociative state. Defense counsel also argues that the danger of unfair prejudice is little because the jury already knows about the abuse. In response, the State notes that the probative value is minimal because this information will be presented to the jury in a much less circus-like atmosphere. Given that there will be testimony from expert witnesses on this point, we cannot conclude that the probative value of a videotape containing over one and a half hours of explicit sexual footage would necessarily outweigh the potential juror distraction. In striking this balance under Indiana Evidence Rule 403, the trial court did not abuse its discretion when it ruled that the videotape was inadmissible.

We also find unpersuasive Marley's argument that her Sixth and Fourteenth Amendment right to present a defense is violated by the trial court's ruling on the videotape issue. Marley may present her self-defense and insanity defenses, bolstered by her battered women's syndrome evidence. This may include testimony from doctors concerning her claimed dissociation and other mental problems. Although the right to present a defense "is of the utmost importance, it is not absolute." *Roach v. State*, 695 N.E.2d 934, 939 (Ind.1998). "[T]he accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). The trial court was within its discretion in concluding that the videotape does not pass the Evidence Rule 403 test and is therefore not admissible.

## Conclusion

The judgment of the trial court is affirmed. This case is remanded for proceedings consistent with this opinion.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.